(March 9, 2017)

■ In the Matter of DENNIS STAVROPOULOS, Appellant, v WILLIAM J. BRATTON, as Police Commissioner of the City of New York and Chairman of the Board of Trustees of the Police Pension Fund, Article II, et al., Respondents. [50 NYS3d 2]—

Order and judgment (one paper), Supreme Court, New York County (Cynthia S. Kern, J.), entered September 15, 2014, denying the petition seeking to annul the determination of respondents, dated November 19, 2013, which denied petitioner's request for an award of a World Trade Center accident disability retirement pension, and dismissing the proceeding brought pursuant to CPLR article 78, unanimously affirmed, without costs.

Petitioner, as an officer of the New York City Police Department, responded to the World Trade Center (WTC) on September 11, 2001, and worked for over 100 hours at the site. In May 2011, petitioner filed an application for enhanced accident disability retirement (ADR) benefits. In his application, petitioner contended that he was disabled by pulmonary hypertension, which had been diagnosed in 2009, and that he was entitled to a statutory presumption that this condition had been caused by his exposure to contaminants at the WTC site under the Administrative Code of City of NY § 13-252.1 (a) and Retirement and Social Security Law § 2 (36). Respondent Board of Trustees of the Police Pension Fund, Article II (the Board of Trustees), following the recommendation of the Medical Board, ultimately denied petitioner's application for ADR benefits, while approving him for ordinary disability retirement, finding that his disability of pulmonary hypertension was not subject to a statutory presumption of WTC-related causation and had not otherwise been shown to have been caused by exposure to contaminants at the WTC site. In the order appealed from, Supreme Court rejected petitioner's article 78 challenge to the determination of the Board of Trustees. For the reasons discussed below, we affirm.

The record establishes that, long before the events of September 11, 2001, petitioner suffered from a number of medical conditions that are risk factors for the development of pulmonary hypertension. Like his father and sister, he was born with the blood disorder thalassemia trait, which affects the red blood cells' ability to circulate oxygen. In 1984, as a result of injuries incurred in a car accident, petitioner underwent an operation to remove his spleen. In 1990, he was diagnosed with iron overload.

In 2009, after being hospitalized for symptoms of exertional shortness of breath and chest pain, petitioner was diagnosed with severe pulmonary arterial hypertension of unclear etiology. At the same time, X rays and CT scans of petitioner's chest revealed that his lungs were "clear." Moreover, pulmonary function tests were normal and clinical lung examinations were within normal limits.

Hypertension, or high blood pressure, can occur in either of the two major loops of the circulatory system: in the set of blood vessels distributing blood from the right side of the heart to the lungs, in which case it is called pulmonary hypertension, or in the set of blood vessels distributing blood from the left side of the heart to the rest of the body, in which case it is called systemic hypertension. Pulmonary hypertension is the less frequent of the two varieties of hypertension. Pulmonary hypertension may be diagnosed as idiopathic pulmonary hypertension if the cause is unknown, or secondary pulmonary hypertension if caused by an identified medical disorder.

Applying for ADR involves a two step process. Initially, the pension fund's Medical Board conducts a physical examination, interviews the applicant, and reviews the submitted evidence, before submitting a recommendation to the Board of Trustees. In the second step, the Board of Trustees votes to either grant or deny ADR benefits. Ordinarily, an applicant for ADR has the burden to show an injury suffered in the line of duty caused the disabling condition. However, a police officer who worked the requisite hours at the WTC site, and is diagnosed with one of several statutorily enumerated conditions, is entitled to a statutory presumption that contaminants at the WTC site caused the condition. In this regard, section 13-252.1 (a) of the Administrative Code provides in pertinent part: "[I]f any condition or impairment of health [of a service member] is caused by a qualifying World Trade Center condition as defined in [Retirement and Social Security Law § 2], it shall be presumptive evidence that it was incurred in the performance and discharge of duty and the natural and proximate result of an accident

not caused by such member's own willful negligence, unless the contrary be proved by competent evidence."

Retirement and Social Security Law § 2 (36) (a) defines a "qualifying World Trade Center condition" as "a qualifying condition or impairment of health resulting in disability to a [service] member who participated in World Trade Center rescue, recovery or cleanup operations for a qualifying period, as those terms are defined below," subject to certain conditions that are not at issue in this case. Retirement and Social Security Law § 2 (36) (c) provides that the physical conditions within this category include, in pertinent part:

"(ii) diseases of the lower respiratory tract, including but not limited to trachea-bronchitis, bronchitis, chronic obstructive pulmonary disease, asthma, reactive airway dysfunction syndrome, and different types of pneumonitis, such as hypersensitivity, granulomatous, or eosinophilic; [and] . . .

"(v) new onset diseases resulting from exposure as such diseases occur in the future including cancer, asbestos-related disease, heavy metal poisoning, and musculoskeletal disease."

Petitioner's application was considered by the Medical Board on three separate occasions. On July 15, 2011, petitioner appeared before the Medical Board for the first time. In support of his application, petitioner submitted his medical records and letters from three physicians, more fully discussed hereinafter, suggesting, without evidence, that there might be some connection between petitioner's pulmonary hypertension and his WTC exposure. Petitioner's medical records noted his various ailments including thalassemia, benign lung nodules, and pulmonary hypertension. Neither petitioner, nor any of his physicians, submitted medical studies linking exposure to contaminants to pulmonary hypertension, or reports of other WTC first responders diagnosed with pulmonary hypertension.

Petitioner appeared before the Medical Board again in March of 2012 and May of 2013, each time presenting new evidence that his pulmonary hypertension had deteriorated. On all three occasions the Medical Board unanimously determined, based on their physical examinations, oral interviews of petitioner, and examination of petitioner's medical records and physicians' letters, that petitioner was disabled by pulmonary hypertension with an unknown cause. The Medical Board recommended denying ADR benefits on the ground that idiopathic pulmonary hypertension, as a blood circulatory disorder, is not included as a qualifying condition under the WTC statute, and petitioner had failed to submit sufficient evidence showing that WTC contaminants caused his pulmonary hypertension. On Novem-

ber 13, 2013, the Board of Trustees denied petitioner's application for ADR benefits by a 6-6 tie vote.

When reviewing a Board of Trustees determination denying ADR benefits pursuant to a 6-6 tie vote, we are not permitted to reverse the Board's determination "unless it can be determined as a matter of law on the record that the disability was the natural and proximate result of a service-related accident" (*Matter of Meyer v Board of Trustees of N.Y. City Fire Dept., Art. 1-B Pension Fund*, 90 NY2d 139, 145 [1997] [internal quotation marks omitted]). "[A]s long as there was any credible evidence of lack of causation before the Board of Trustees, its determination must stand" (*id.* [internal quotation marks omitted]). Credible evidence is "evidentiary in nature and not merely a conclusion of law, nor mere conjecture or unsupported suspicion" (*id.* at 147).

On appeal, petitioner initially argues that pulmonary hypertension is a qualifying WTC condition as a "disease[ ] of the lower respiratory tract" (Retirement and Social Security Law § 2 [36] [c] [ii]), because the arteries affected by pulmonary hypertension circulate blood from the heart to and within the lungs. However, the Medical Board specifically found that petitioner does not suffer from any disease of the respiratory tract, noting that, at the time of his pulmonary hypertension diagnosis, X rays and CT scans revealed that his lungs were clear and that the results of pulmonary function tests—which measure the lungs' capacity to hold and move air in the body— were normal. Further, the examples of "diseases of the lower respiratory tract" set forth in Retirement and Social Security Law § 2 (36) (c) (ii) are all diseases of the actual pathways or passages through which air passes within the lung (*see* Stedman's Medical Dictionary 2010 [28th ed] [defining "respiratory tract" as "the air passages from the nose to the pulmonary alveoli, through the pharynx, larynx, trachea, and bronchi"]; *see also id.* at 2008 [defining "tract," in pertinent part, as "a passage or pathway"]). The pulmonary arteries, although within the lung, are not part of the respiratory tract in this sense. Following the rule of statutory construction known as ejusdem generis (*see* McKinney's Cons Laws of NY, Book 1, Statutes § 239 [b]), we construe the statutory term "diseases of the lower respiratory tract" to be limited to diseases of the actual airways within the lung, like the specific examples of such diseases set forth in Retirement and Social Security Law § 2 (36) (c) (ii). Accordingly, petitioner's pulmonary hypertension, although it is a disabling condition, is not a qualifying WTC condition. It follows that petitioner is not afforded the

presumption that this condition is a result of his exposure to toxins at the WTC site.

Petitioner next urges us to recognize pulmonary hypertension as a new onset disease caused by his exposure to WTC contaminants under Retirement and Social Security Law § 2 (36) (c) (v), which, to reiterate, contemplates extension of the presumption of WTC causation to "new onset diseases resulting from [WTC] exposure as such diseases occur in the future," and gives four examples of categories of possible "new onset diseases" (cancer, asbestos-related disease, heavy metal poisoning, and musculoskeletal disease). While this provision certainly does not limit "new onset diseases" to the aforementioned enumerated categories of illness (none of which affect petitioner), it merely recognizes that, in the future, additional diseases may be connected to exposure to contaminants at the WTC site. We are not persuaded that the legislature intended the "new onset" category to extend the presumption to additional, non-enumerated illnesses based on mere speculation that such conditions may have been caused by exposure to WTC contaminants. Rather, an applicant asserting for the first time that a disease should be recognized as a new onset disease has the burden to submit evidence showing that the disease has been linked to exposure to WTC toxins and therefore qualifies as a new onset disease (*see Matter of Anastasio v Kelly*, 121 AD3d 466 [1st Dept 2014], *lv denied* 25 NY3d 907 [2015]; *Matter of Quinn v Kelly*, 92 AD3d 589 [1st Dept 2012], *lv denied* 19 NY3d 813 [2012]; *Matter of Fesler v Bratton*, 48 Misc 3d 444, 449 [Sup Ct, NY County 2015]). Once a court has recognized a disease as a new onset disease caused by exposure to WTC contaminants, subsequent applicants diagnosed with the disease will be entitled to the presumption as a matter of law. Here, however, pulmonary hypertension has never previously been recognized as related to exposure to WTC site contaminants and petitioner has not presented any evidence that such a connection exists.

The record is devoid of any medical study linking exposure to WTC site contaminants to pulmonary hypertension, nor does it contain any evidence that other WTC site responders have been diagnosed with this condition in numbers greater than would be predicted from general epidemiological experience. The sole evidence petitioner relies upon to satisfy his burden of showing such a connection are brief and conclusory letters from three physicians which, in equivocal language, speculate, without referring to any supporting scientific or epidemiological evidence, that there may be a link between pulmonary

hypertension and WTC exposure. For example, Dr. Karen Haglof, a hematologist, after deprecating thalassemia as a possible causes of petitioner's condition, concluded that she "d[id] not feel that his pulmonary hypertension can be incontrovertibly related to thalassemia as opposed to his 9/11 exposure." Similarly, Dr. Peter Rouvelas, a cardiologist, offered the view— without the slightest explanation or support—that petitioner's WTC exposure "appears to be etiologically the cause of his present condition and status." Finally, Dr. Evelyn Horn, another cardiologist, stated: "In the differential must [sic] still include WTC and any foreign body reaction that led to any inflammatory mediated disease."

None of the aforementioned three physicians, whose brief letters were submitted by petitioner, pointed to any scientific literature drawing a causal connection between exposure to contaminants present at the WTC site and petitioner's disabling condition, pulmonary hypertension. These physicians simply asserted, without support, that such a connection might exist. Such equivocal, unsupported, and speculative statements, even if made by physicians, do not satisfy petitioner's burden to submit credible evidence showing that exposure to WTC contaminants caused his pulmonary hypertension (*see Anastasio*, 121 AD3d at 466; *Quinn*, 92 AD3d at 589; *Matter of Welch v Safir*, 293 AD2d 295, 296 [1st Dept 2002]; *Fesler*, 48 Misc 3d at 449).

Because petitioner's disabling condition of pulmonary hypertension does not fall within any category enumerated in the statute, and has never previously been causally connected to WTC exposure, there is no basis for applying the presumption in the first place, and it remains petitioner's burden to come forward with evidence showing that such a connection exists (*see Quinn*, 92 AD3d at 589 [affirming denial of petition for ADR benefits where the disabling condition of cardiomyopathy was not a qualifying condition under the statute and "there was no known association between exposure to toxins at the (WTC site) and the development of viral myocarditis"]). The equivocal and unsupported speculations of petitioner's physicians do not satisfy this burden. Accordingly, Supreme Court correctly decided, based upon a review of the credible evidence presented to the Medical Board, that it cannot be determined as a matter of law that the Board of Trustees erred by accepting the Medical Board's recommendation to deny petitioner's application for ADR.

Contrary to petitioner's contentions, this Court's decisions in *Matter of Sheldon v Kelly* (126 AD3d 138 [1st Dept 2015], *lv*

*denied* 25 NY3d 908 [2015]) and *Matter of Dement v Kelly* (97 AD3d 223 [1st Dept 2012]) do not hold that the mere allegation of a link between a disease not within a category referenced in the statute and exposure to contaminants at the WTC site shifts to the Board of Trustees the burden of disproving such a connection. *Sheldon* involved diagnoses of fibromyalgia (a musculoskeletal disease) and heavy metal poisoning, both of which are categories of disease specifically referenced in the statute (Retirement and Social Security Law § 2 [36] [c] [v]), unlike pulmonary hypertension, as previously discussed. Similarly, *Dement* involved diagnoses of heavy metal poisoning and severe gastrointestinal reflux disease, the latter of which is specifically referenced in Retirement and Social Security Law § 2 (36) (c) (iii), which were linked through competent evidence to the applicant's disabling condition of sleep apnea, which had also been reported by other WTC responders (*see Dement*, 97 AD3d at 226-230). Neither does petitioner's position find support in *Matter of Bitchatchi v Board of Trustees of the N.Y. City Police Dept. Pension Fund, Art. II* (20 NY3d 268 [2012]). Each of the three petitioners in *Bitchatchi* had developed cancer, a category of illness specifically identified in the statute as a possible "new onset disease," and the issue considered by the Court of Appeals was whether the presumption of WTC causation had been successfully rebutted, not whether it applied.

Finally, petitioner's argument that the benign nodules that were found on his lungs qualify as a listed condition fails. Both the Medical Board and petitioner's own doctors agree that the benign lung nodules are not a disabling condition. Moreover, petitioner did not submit any evidence showing that the nodules contributed to his disabling condition of pulmonary hypertension (*see Matter of Appleby v Herkommer*, 165 AD2d 727, 729 [1st Dept 1990]).

In closing, we acknowledge the honor due petitioner for his service as a first responder at the WTC site, at great risk to himself. The hardship endured and sacrifices made by selfless public servants such as petitioner should always be remembered with gratitude. However, it is for the legislature, not this Court, to delineate the procedures by which to determine whether the disability of a particular first responder is the result of service at the WTC site. At this juncture, the legislature has not extended the presumption of WTC causation to all disabilities subsequently developed by those who responded to the September 11th attacks. This Court is obligated to limit the applicability of the presumption to the

scope the legislature has provided for it. Petitioner's remedy, if any, lies with the legislature. Concur—Friedman, J.P., Renwick, Richter, Moskowitz and Kapnick, JJ.